1-4-3-1-4-8, Gerald Hand v. Marc C. Houk-Warden. Arguments not to exceed 30 minutes per side. Ms. Kors for appellant. Good afternoon, Your Honors. Jean Kors for appellant, Gerald Hand. I'd like to reserve three minutes of my, or seven minutes of my time. Seven minutes? Seven Fine, thank you. Your Honors, we raised a number of issues in our briefing in this case, but for purposes of today, I'd like to focus on two specific issues, and those both involve claims of ineffective assistance of counsel. The first claim involves, our claim involving the voir dire in this case, and specifically trial counsel's failure to conduct any inquiry regarding the pretrial biases of two of the jurors on the panel, and these were biases that were demonstrated and shown to exist in the juror questionnaires themselves. The second issue I'd like to address is trial counsel's deficient conduct at sentencing, and specifically its failure as we submit to put on an effective mitigation strategy. With respect to the question of ineffective assistance of counsel with questioning regarding pretrial publicity, the Sixth Amendment guarantees criminal defendants the right to be tried by an impartial jury, and as this court has recognized, among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are of counsel based on trial counsel's object failure to address in any manner the biases that were stated in the juror questionnaires of two specific jurors. With respect to this case, the pretrial publicity in this case was widespread. This case was in Delaware County. It was one of the biggest cases at the time, and we direct the court to record citation 6526 to 6617, and that's a compilation of the many newspaper articles that were compiled and are in the record relating to this case. I'd like to call the court's attention specifically to two articles, though. One I draw the court's attention to primarily because it's actually referenced by one of these two jurors we're going to talk about, but there was a gag order in place here, and the articles that appeared in the newspaper were very, very one-sided, and I just want to draw the court's attention to a few of the references in these. First, a case from March 2nd, 2002 that relays a fair amount of detail from the affidavits in support of the search warrant to search Lonnie Welch's house, who is one of the victims here. A stack of money, supposedly part of a $50,000 payment to Walter Welch to kill Jill Hand, was seen. The court documents said police were told that Welch admitted to others that he killed Hand's first two wives. The document states, in his review of the Donna and Lori Hand murders, detectives of the police unsolved homicide case review team noted that Mr. Hand received substantial monetary payment from insurance policies. The detective also states that Donna, Lori, and Jill Hand were planning to divorce Hand before their deaths. According to the court papers, a Welch family member told police in late January that Welch was going to Hand's house to do one final job. The family member said Welch told him he would collect a large sum of money. That was from an article in early 2002. Here's one right before the trial, referencing that Hand's first wife and second wife were found murdered and giving detail regarding that. References that Welch was in fact a very good friend of Hand. References that Hand was planning to divorce both women. Counsel, just so I can orient myself, pardon me you or your brief for the clear way in which the issues were presented was helpful to me. Thank you. Where in that are you right now? You're doing ineffective assistance of counsel for not having more vigorously presented this issue? Correct. The claim here is that trial counsel was ineffective for who ended up being placed. The district court ruled alternatively that there was procedural default and that there was no merit, is that correct? Correct. Those issues get at the deference? Well it's a de novo review here of this court on the ineffective assistance claim. We would note. Did the state court rule on either of those? No, and the basis for overcoming the procedural default here is both cause and prejudice. This issue was an issue that could have been dealt with by the counsel on direct appeal. In fact, they expanded the record to specifically obtain these juror questionnaires, but direct appeal counsel did not raise this issue on direct appeal. So we submit there. What about on collateral state review? Was there on this issue? Can I have a second to confer with counsel? Yes, your honor, it was in the post-conviction. And what did the post-conviction state court do on the issue that you're currently now arguing? That's all I'm trying to find out so I know what exactly it is we're asking. Race judicata, your honor. They ruled race judicata. They ruled that it should have been raised before and it wasn't raised so it was procedurally default. Correct. And so it never reached this issue. Correct. This issue has not been dealt with on the merits. And what was it that you had just said about not getting the juror questionnaires? Wouldn't the defense have had the juror questionnaires at trial? Yes, and they did have the juror questionnaires at trial and that's the basis of our ineffective assistance of counsel claim. These questionnaires were drafted by counsel. They were put before counsel. Counsel had them at the time of the voir dire. And counsel heard the the questioning and questioned about some other things. Looking at, to me, more Fenimore is the one that wrote on the questionnaire, quote, seem probable was involved. And your brief then says when asked whether the publicity made her think that Hand was guilty, Fenimore answered yes. Does that mean orally at the at the voir dire? No. That was question 63 in the questionnaire and that's page ID 6638. And here's the question. Based on your exposure to these in the newspaper and elsewhere, do you think Gerald Bob Hand is guilty? The options were yes, no, not sure, do not know, and this potential juror answered yes. Okay, and then there was oral voir dire. The counsel got to see the person, got to see their responses, and there was oral voir dire. Decided not to challenge for cause and not to use, they had peremptories presumably. Correct, but I'd like to focus a little bit on what the voir dire was. Trial counsel asked no questions of these individual jurors regarding the pretrial publicity. Either Juror Ray, who said the pretrial publicity that she saw left her wondering, or Juror Fenimore. Trial counsel didn't exercise a peremptory. Trial counsel did not seek to dismiss this juror for cause. Trial counsel saw and heard the things that the judge asked collectively and the answers that were given. Correct. That is correct, and I'd make two points on that. First, that was group colloquy. These jurors were questioned in groups of three to four jurors, and there's strong... Generally, or was this a group of three to four jurors? The groups range from three to six, and I'm not sure standing here how many were in this group, but they were all brought in. In this particular group? It might be in the record. I do not know. I can check and get back to you if you would like, but I would state it was... Do we have a transcript of that? That is, in other words, did they say, hey, anybody have any problems? Or did they say, you know, juror X, can you set up questions, juror Y? There is a transcript. Some of the questions were directed at the group. Some of the direct questions were directed at the individuals, but none of... no questions were directly asked of these two jurors regarding pretrial publicity and whether these specific two jurors, what the basis... The group was asked those questions, but I'd simply refer to this court to a lot of authority, including the Supreme Court decision in Irwin v. Dowd, where the court called into question the effectiveness in terms of rehabilitating a potential witness when you do this through group questioning. Other cases in this court as well have, you know, noted that this type of group questioning is just not effective. There is a psychological effect that can happen. There's no constitutional principle that prevents it, I take it. You said Irwin v. Dowd, quote, called into question, that is, they pointed out some problems under the facts of that case. Let me ask you this, do we know how many peremptories they had? Did they use them all? That sort of thing, is that in the record? It might be in the record. I do not know here whether... how many there were. How many were... how many total were interviewed? I guess the reason I'm asking these kind of questions is that when you're a trial lawyer picking a what else you might have, and one might consider if you once you've seen the person, seen their answer, that pressing it wouldn't be a good idea, that they seem pretty good now, that it was an offhand. I mean, particularly with the one about wondering. I must say, when I look at the two of them, the wondering just doesn't bother me at all. The other one, I think, is considerably more problematic, but we weren't on the spot. So that's what I was asking about things that would, might go to overall strategy. Okay, go ahead. So again, I'd just like to go back to the fact that trial counsel did not take any action here. When faced with particularly juror Finnemore's answer, that we would argue would require a presumption of bias. There was an opinion that had been formed based on that juror questionnaire. Do we have any, because as you said, that you have a piece of paper that, you know, asks you to focus and asks you, what, have you formed an opinion, or from this, what do you think? Can you read that again? Because it sounded like, based on this, what do you think? But I don't want to say that because... Sure. Based on your exposure to these allegations on TV and the newspaper and elsewhere, do you think Bob Hand is guilty? Okay, so that, I mean, that, that's, that doesn't put you in the mind of a juror who is focusing on, I'm supposed to listen to the evidence. You know, it's like calling on you in class, what do you think? I'd be interested, is there any evidence about the generality of these questionnaires? For example, you know, out of a hundred people, 60 of them said yes, and half of those were seated on the jury, or is it nobody said yes except this one person? What we have seen in the record, this was the only instance of a juror being seated who said yes. Whether there were other questionnaires out there, I don't know. Well, when you say that's the only one you know, that's the only one that we've got put in the record, is it? Correct. Okay. And I simply know, you know, there is Supreme Court authority that where a potential juror has formed an opinion, there is a presumption of bias, and that presumption can be overcome through rehabilitation, through, you know, individual inquiry, but there is, an opinion was formed here based on... Is that a usual kind of questionnaire? In other words, it seems to me it's prodding them to give an answer that in the jury context they're not supposed to give, but in the question, you know, what do you think? You think the Packers gonna win? Do you think Trump should have been president? Whatever. It's prodding them to give a top-of-their-head answer. So as far as you know, is that asked repeatedly in Ohio as a questionnaire? I don't know if it's asked repeatedly. Certainly from the record, it's clear that these questions were specifically asked because of... Do you have any case, is there any case where that kind of a question and answer is discussed? Because you see, the reason I'm pressing this is, have you formed an opinion that puts you in the mind of, oh, I'm supposed to be fair, you know, well, I haven't formed a real opinion, as opposed to, well, what do you think? I have not seen a case that addresses this kind of question. Okay. I would then direct the court to the next question in the questionnaire, though. Please explain your answer. What has been presented seems to indicate probability of guilt. So, you And that's a different answer than the answer, seemed probable he was involved? Yes. Question 62, which was, what impressions did it leave in your mind? The response was, seemed probable he was involved. 63 is where he states... I'm not sure that indicates I think he was involved. It's like, this kind of information makes involvement more probable. Certainly. Literally. And I mean, we're picking it apart a little bit literally, but literally it's not that problematic. It just sounds like that's the direction he might be going in. I think, you know, stepping back from this, I think the issue and the problem here is, you were faced with a juror who saw publicity. There was widespread publicity of this case. There was a gag order. Ten of the twelve said they had seen some publicity. Correct. And you now have a juror saying, I saw publicity, and I think Gerald Hand is guilty. That's an answer. You can't say that. Well, do you think Gerald Bob Hand is guilty? The answer is yes. So, I would submit that is an opinion. That is opinion that warrants a presumption of bias. Was this juror, at the end of the day, a biased juror sitting on the jury? I don't think any of us can answer it because no inquiry was done, but what the law does tell us is in this instance, there needs to be some type of searching inquiry to overcome that presumption. Let me mention Judge Beckwith's opinion below calls it a small group of seven and that says, is there anything you may have read, seen, or the judge then said, is there anything you may have read, seen, or heard that caused you to form an opinion? And they all said no. And can you, does anybody have any concerns? So, I suppose what you're saying is he could have said, well ma'am, what about your questionnaire? Isn't that contrary to what you just said? Or I think even more direct. He could have said, we have an issue with this potential juror. Either I'm seeking to strike him or I'd like to conduct an individual inquiry into these answers. I think there was a lot this trial counsel said, you might say, he then did question her about would she be able to consider a verdict other than death. And they got into, you know, back and forth about, I believe the New Testament, not the old. Well, gee, maybe that sounds pretty good. You know, I'd like a New Testament juror rather than Old Testament juror. My response to that is that had not, that was not specific to Mr. Hand. There still had never been an inquiry as to how firm was this opinion. No, I understand that it's a different, but it's eliciting useful information. Correct. I would then direct the court to this court's decisions in Quintero and Hughes, the Supreme Court decision in Irwin v. Dowd, where the court simply recognizes that these group questioning is not effective in terms of overcoming a presumption because in a group, potential jurors are much less likely to admit a bias. Does the court have any more questions? I have some questions. In what I take to be your opposing counsel's response to this talks about prejudice. Do you have to show prejudice as well? We would argue prejudice is presumed here because there was a presumption of bias that was never overcome, and we direct the court... Quintero v. Bell is one decision that I would refer the court to. Quintero was a situation where there was a potential bias indicated based on... The jurors had already ruled on the same issues in another case, is that the case? Correct, but they had never... Based on the TV allegations, I would think he's guilty. It's a little bit different from having been on a jury that found those facts, isn't it? Well, anyway, maybe it's distinguishable, maybe it's not. Is there have to go and look at some of the Supreme Court authority that's out there that says where an opinion is formed, a juror can't be impartial. And here I would argue an opinion, particularly with respect to juror Finnemore... It doesn't matter whether you think he's made the inquiry or not. Well, I think it does because... I'm talking about the harm that comes from the failure to interrogate. Here's the harm I would state, okay? There was no inquiry made. I submit there was a presumption of bias created by these answers. If that presumption of bias is not overcome, and if there is no rehabilitation of that juror, and that juror sat on the jury under the reasoning of Quintero, we would admit that prejudice is presumed. And given all of the other answers that were asked and given, what would have been required to, quote, overcome the presumption? Because your statement a minute ago was simply, if an opinion is formed, there's a presumption of bias. Any kind of opinion at any time, for any reason? No, I think the law would state that it depends on the strength of that opinion. How deep is that opinion held? And that's why the individual inquiry is so important, to understand how strong that opinion is. This answer suggests this juror believes Bob Hand is guilty. Could that juror be rehabilitated? Potentially, yes. We can't say that there couldn't have been a reasonable record created that would have overcome that bias. In your view, the questions that were given, can you rely on the evidence, can you put aside concerns, etc., none of that's good enough. I don't think so, no. What would have been good enough? No, not in that group context. What could have been good enough? An individual question outside of the presence of other jurors. Okay, so your line here is relying on Irwin or others that she couldn't have been rehabilitated without individual questioning outside the presence of the others, which would have had to have been permitted by the judge. That is, under the circumstances that was presented, the lawyer, if he had asked more, would have been in the group setting. Correct, and again, he didn't do anything. I mean, here we're not talking about this lawyer having done something with respect to these questions in the juror record. These lawyers took no action. All right, you may want to hit your second point. I'm not going to have much time on that, but the second point relates to the that was presented during the sentencing, and we would argue that trial counsel was ineffective for failing to put on any effective mitigation. There was substantial, substantial potential mitigation in the record. What's your best point on that? I mean, I read the stuff about the no antisocial personality. I read the stuff about some of the siblings. I read some of the stuff about, you know, he was nice to his Boy Scout troop. Kind of, what's your best shot? Our best shot, the district court held that Dr. Davis, the expert, put on a comprehensive description statement regarding these background factors. I've looked at that statement. It's one page of transcript, a very sanitized, truncated version. It doesn't even refer to any abuse that may have occurred versus Bob Hand. The entire focus of that sentencing, that last 87 pages, if you look at the actual testimony that was put in through witnesses, three witnesses, the total approximately 12 pages of transcript. Also, I would direct... The 87 pages is the whole hearing, and the defense case was 12 pages, or the 87 pages is the whole defense case? The 87 pages is the whole defense put on three witnesses. The first witness was Dr. Davis. I don't have the total number of his pages, but with respect to his statements regarding this very dysfunctional background that Petitioner Hand had, it is one page of transcript. Okay, but basically, then, you might say, in all of these cases, you can go the poor me route, or you can go the time-salvageable route, and you're saying that they didn't go... They didn't use everything they had on the poor me route. They, in fact, used very little of it. I think... Is that fair? I mean, you know, yes, I've read the part about all the children had different fathers, and there was abuse in the family, and so on, and clearly, a lot of that was not presented. Is that sort of the basic shot? Yes, and I think I'd go a step farther and say there's a real question here whether trial counsel simply did not put that case on because trial counsel thought it wouldn't do any good, and this court has said in Austin v. Bell that's not effective trial strategy. As opposed to, he's a nice guy, he can be salvageable, he'll be good, he can be a mentor to his children, he can... so on. I mean, isn't that always a strategic choice? Might be a strategic choice, but I'd say that was hardly put on here, if at all, either. I just want to know what the scope of review is for this one as well. Is this DeNovo as well, or is this one AEDPA? This is DeNovo. Because they didn't raise that below, either? Well, it was raised below, yes. So there, I mean, there is a... The state court found that it was trial strategy. I'm sorry, yes, it is given... What is epidefference, then, for that issue? Hmm? I'm just trying to figure out what my job is here. Well, it would be, was there an unreasonable application here, and here I would argue, yes, there was an unreasonable application. It's not a distinction to the earlier issue you were talking about, where you're saying that we have DeNovo review because the state court never reached... Correct, sorry, yes, there is, there is review here. Good, that's it, thank you. Any further questions? Thank you. May it please the court, Assistant Attorney General Charles Welley arguing on behalf of the Warden. Your Honors, I'd like to first start with the procedural history of the ineffective assistance of trial counsel claim with respect to the voir dire concerning the two jurors. This was found to be res judicata when raised for the first time on post-conviction, the court concluding that, based on the record, it could have been raised on direct appeal and was not. However, a claim was also presented of ineffective assistance of appellate counsel, and one of the allegations in that claim was that the appellate attorney should have raised trial counsel's alleged ineffectiveness. That claim was adjudicated on demerits, albeit with a summary unexplained denial by the Supreme Court, nevertheless subject to deference. So, in essence then, what we're really talking about here is, in looking at the underlying claim of juror or alleged juror bias, we're actually looking now at two additional layers which must be addressed of deference. Here we have, we must have, first we must defer to the state Ohio Supreme Court's determination that this claim, if raised, would not have succeeded. I'm sorry, you said it was very summary. Did the Ohio Supreme Court say, if this had been raised, it wouldn't have succeeded, or is that your interpretation? Oh, Your Honor, they simply denied his application. But we would rely on well-established Supreme Court precedent, which indicates that unless there is a presumption, even in an unexplained decision. Okay, so it was unexplained. But that there's nothing here to overcome that presumption. Now, as a matter of fact, there is something which suggests that it was merits, because Mr. Hand attempted to file a second application to reopen based on the basis of appellate counsel. And in that case, the Ohio Supreme Court explicitly denied it based on a failure to comply with the timeliness rule. So that would seem to indicate that the Ohio Supreme Court knows, it has a practice, that if it's denying the application based on timeliness or a procedural rule, it will tell us that. But in any event, we take a look at this case. So what we have here is this. Ultimately, what this comes down to is, is there a reasonable probability of a different result, meaning, and that is the prejudice standard here, is there a reasonable probability that had appellate counsel raised on direct appeal, trial counsels alleged ineffectiveness, that it would have succeeded? The appeal would have been won because the court would have held that, yes, indeed, there was prejudice, there was bias, which would require overturning the conviction. Your Honor, we would submit that based on the findings of the district court, that that's highly unlikely. The court made explicit findings on this with respect to the type of voir dire that was conducted and the jury questionnaires. Now, the jury questionnaires were in the record, and I thought it was interesting myself that the questionnaire says, at one point, there was a lot of publicity in this case. I thought that was pretty interesting. Now, as far as I can tell from reading the record, these questions, my point is that, I guess my point is that there's, unlike some cases where there might be a dispute as to the degree of publicity involved in a case. In this case, there was no dispute. Yes, there was a great deal of pretrial publicity. Everybody understood that, and I guess it's a matter of somewhat common sense that a case involving a person accused of murdering two people in the course of a conspiracy to murder three of his wives, that would tend to generate a lot of publicity. Now, there is a sentence there that says, based on your exposure to these allegations in the newspaper and elsewhere, do you think Bob Hand is guilty? He said yes. It is true the next sentence says explain your answers, so we actually know what he means by that. What has been presented seems to indicate probability of guilt. Let me address that, Your Honor. If you excuse me, let me refer to my notes here. I thought this would come up, and so I've made some notes specifically with respect to the findings that were made by the District Court. The District Court held that, with respect to the juror, Ray, that the jury questionnaire asked if they had seen or heard anything about the case, and if so, quote, what impression did the article leave in your mind? And the juror, Ray, stated that she had seen a local newspaper article in April 2003, which had left her wondering. Now, she also said, however, on the questionnaire, that she answered questions to indicate that she had no opinion on whether Hand was guilty, that she could put the article out of her mind, and could follow the court's instructions, and that she believed in the death penalty, but thought it was not appropriate for most murderers. That's Ray. That's Ray. Now, if we, okay, let me go to the next one. Page 48 of Beckwith's, I think, is what he's reading from. I'm on page ID 6638. Okay, that's the questionnaire. Now, juror, testimony about what's in the questionnaire, we can look straight at the questionnaire. Yes, what I'm doing is I'm looking at the questionnaire myself, and referring to what the juror said. Juror Finham, I have the questionnaire, that's what I'm referring to. Juror Finham stated in her questionnaire that she had seen articles and news reports about the case two or three times, which left her with the impression that Hand was probably involved in the murder, and was guilty. But, she also said, in her questionnaire, that she would be able to put that information out of her mind, and have a decision, and base a decision on the evidence, and the court's instructions, that she would have no problem following instructions to avoid the news media during the trial. Yes, that is, I've got it down as the questionnaire for juror 453. That's, yes, it's page IDs number 9256 to 9259. Yeah, that's, you know, my understanding is, I mean, that's, well, this is, I thought a little bit of problem myself, is that the questionnaires, I couldn't find any jurors name on them, so I had to go back through the transcript, and kind of piece together which juror, but from my reading of the transcript, that indicated to me that that was juror Fenimore, that that was her questionnaire, especially with respect to the, because it did say that, you know, she had formed an opinion. I mean, that she was the juror who said that. Yeah, the questionnaires were by juror number. Yeah, Fenimore was, Fenimore was, let me just, her, she was 453, I think. And she says, I mean, I think you can have an answer to it, but you seem not to want to answer it. Well, I hope my citations are correct, because I think she went on to say in the questionnaire that she could... Which questionnaire number is something like, you know, can you put the information, you were reading from Beckwith's opinion at page 48, I was following word-for-word, and the stated that she was able to put that information out of her mind must be an answer to some question on the questionnaire. Yeah, and I've got that at, maybe I got the wrong numbers, but I've got that at page IDs number 9256 through 9259. That's the whole... That's the holding? That's the whole questionnaire. Well, let me... We're sort of asking, in the questionnaires, is there a information out of your mind? In other words, we're... Right, 62, 3, and 4 are the three questions that your adversary has been focusing on. One would think logically it would come after 64, but... I beg your indulgence, Your Honors. I'm Yeah, I'm looking at, Your Honor, I'm looking at page ID number 9258, where it appears to be to be a questionnaire, and it says... Yes. It's paragraph 64 that where she says that... And then if you go on to say, if selected as a juror on this accounts of this case in television, etc., will you have any difficulty following this order? No. If what about... About if you have... What about she would be able to put the information out of her mind and base a decision on the evidence? What about that question? Yeah, this is the previous one. If you have been exposed to media coverage in this case, will you be able to put any and all... There we are, there we... Information out of your mind and base your decision solely on the evidence presented to the court and the instructions of law given by the court. And that's what that's... She says... An easier answer, though, might have been that 64 qualifies 63 substantially. Oh, yeah. Because the issue here, I guess, your opponent agrees has to do with prejudice, and I think her point was that if it's clear enough that the person has decided the case, that's prejudice. And if it's just something that might make you think that there's a problem, then it's not necessarily prejudice unless you show some prejudice. I don't know. Is that your answer? No, no, your honor. I guess I'm not following because these... The judge... The district court held that these answers seem to indicate that the juror was willing to put aside any previous opinion and consider the case fairly. And that is something which... And it's also... It is noteworthy that this juror did indicate some opinions which would be favorable to the defense. Now, remember here, we're talking about ineffective assistance of counsel. So is it reasonable to think that a lawyer might decide that even though a witness has given equivocal answers based on the pretrial publicity, that this juror nevertheless has given answers which indicates that the juror might be a good juror for sentencing? Then if that's a reasonable proposition that a trial attorney could come to. And also, when you're talking about an appellate attorney, if the appellate attorney is confronted with a record in which the trial attorney apparently elected not to ask any follow-up questions, the juror also gave him responses which might be conceivably thought of as being favorable to the defense. Do you agree that if we get to this issue past the procedural default issue, that our review is de novo? No, your honor. I would submit that in order to get to this issue, you have to first determine that the counsel was ineffective. The appellate counsel was ineffective. Well, I suppose this, your honor, is that... I'm sorry, I want to answer your question, but it would seem to me that the answer would be it wouldn't matter. It wouldn't matter, your honor. I guess I should have said this, your honor, it wouldn't matter. Because if this court concludes that the Ohio Supreme Court was unreasonable in concluding otherwise, then the court would have had to obviously concluded that yes, the trial counsel was ineffective and there was prejudice. Because I don't see how you could possibly ever find ineffective assistance of appellate counsel here, unless you also thought that the underlying issue, which appellate counsel allegedly failed to raise... First a procedural default issue, and then if you get past that, there's a merits issue. But you're seeming to say that to get past the procedural default, you've got to find prejudice, and once you've found prejudice, you've decided the ultimate issue on the merits. That's pretty much... and that's not unusual that that happens. I know that this court... That means that we have to look at the merits prong of the issue using epidefference? Yes, at least with respect to the appellate effectiveness. Yes, absolutely. Because there you have a merits adjudication, and you're looking at deference to the Ohio Supreme Court's unexplained, but nevertheless adjudication merits on the merits. Resolve the procedural default issue by saying there, hypothetically in a different but similar case, you could say there was no procedural default because material from outside the record was integral to the issue. You wouldn't have to say anything about the merits, you could just say it wasn't procedurally defaulted, couldn't you in some case? Yes, you could. In that situation, then you would go to the merits, and the merits would be de novo or not. Yes, it would be. Now, you're right, Your Honor. The argument here is that there's no procedural default, not because, maybe partly because of the merits issue, but partly because they were saying that there was stuff that was outside the record that needed to be addressed, and that therefore Resolute Decada didn't apply. May I address that, Your Honor? I'd like to address that. In this situation, what was the evidence that was more... I'm trying to ask a scope of review question. Well, I agree with you. I apologize, Your Honor, if I'm not making it clear. Yes, I didn't mean to suggest that under no circumstances could you end up with de novo review. If we were to decide that this case was not procedurally defaulted because of this out-of-the-record, in-the-record dispute, and then we got to the merits, would the merits be reviewed by us de novo or not? Yes, in the event that... In the event, yes. Yes, Your Honor, yes. And again, I don't mean to be obtruperous on this, Your Honor, but there's a lot of layers here. As you know how procedural default works, there's a lot of layers that sometimes one has to get through. What is your short answer on what was outside the record or why you think it wasn't really outside the record? My understanding is it was simply more evidence that there was publicity in the case, newspaper articles. That was not disputed. The degree of pretrial publicity was not disputed. Also, Your Honors, the whole gist of this case is the record tells... I mean, you heard counsel say it herself. The record shows that there was bias here or presumption of bias. Well, if the record shows that there was a presumption of bias, there was no... Under Ohio law, it had to be raised on direct appeal. And the trial court in... The Ohio trial court and the Ohio Court of Appeals were correct in finding, implying race judicata. So I would submit, Your Honor, that in this case, the claim is apparent from the record. The argument today is still based on the record. And the fact remains that an appellate account... There was a claim that appellate counsel should have raised it. And the Ohio Supreme Court concluded that appellate counsel was not ineffective. And that unexplained decision is on the appeal of the state post-conviction? No, Your Honor, that... The way this works in Ohio is that this case was directly appealed to the Ohio Supreme Court. Because it's a death penalty case. Yes. And Ohio Supreme Court has a rule that says, how do I raise ineffective assistance of appellate counsel at the Ohio Supreme Court? I apply to reopen my direct appeal. Oh, this is the crazy 26B? Yes. Although... Sorry for the opinion, but that's... But no, that's not the... I mean, it's the Ohio Supreme Court... So this is the Ohio Supreme Court decision on the 26B proceeding? The first one, exactly. The first one. But the one you're relying on, which you say, as an unexplained decision, nevertheless, it's the right one to look at and give deference to. Yes. The Ohio Supreme Court decision on the appeal of the 26B motion. Yes. Okay. Thank you. Yes. In terms of... Again, in terms of appellate counsel and taking a look at the deference to appellate counsel, appellate counsel, if he were thinking about raising this issue, again, has to overcome three barriers here. He has to overcome a record which does indicate that at least there was some equivocation in the question here. He has to overlook a record which shows that there were some things which indicated the juror might have been positive to the defense. And he also has to overcome the presumption that trial counsel was effective because that presumption would apply when a claim was raised on direct appeal just like it applies every other place. Now, you also have to take a look at the district court found that the trial judge did conduct small group voir dire, seven or eight jurors at a time, and that these two jurors were apparently were in the same group. The trial judge also asked the jurors if they have any... they recall their questionnaires, and if they have any reason to challenge... to change anything or disagree with anything, said no. Trial judge also asked the jurors, now, are you prepared? Three times the trial judge said, are you prepared to decide this case not on the media, not on what you saw and heard, but what is presented to this court. And three times, the record discloses that three times there was negative responses. So in the light of those findings, which are undisputed, it's certainly reasonable to conclude, if you're the Ohio Supreme Court, that raising trial counsel's ineffectiveness in this instance probably would not have succeeded on appeal. And there again is... that's the real guts of this case, I would say. I mean, procedural default... some excellent questions about procedural default, but ultimately, we know this. We know that the Supreme Court of Ohio looked at the question from the aspect of appellate ineffectiveness, and it's not unusual. I mean, this court, a lot of people who have appellate ineffectiveness claims have said, look, we can just take a look at the underlying claim for the purpose of... well, we'll look at the merits for the purposes of evaluating whether it was a clearly stronger claim. And of course, that's the constitutional standard. Can you really say that this claim was clearly stronger than other claims that were presented on direct appeal? They could reasonably conclude that we don't think so. We don't think this claim was clearly stronger. And to a certain extent, that does take a look at the merits, because obviously, to make that conclusion, you have to look at the merits of the claim to some extent. Now, when you say making the judgment about is clearly stronger, not clearly stronger, and so on, are you rolling that into the unexplained decision of the Ohio Supreme Court, that that would have been an adequate and reasonable decision? Yes. And again, we would rely on the Supreme Court's decisions which indicate that's proper, that that's okay to do. As far as the questioning itself, again, one of the classic examples of tactical decision-making as a trial attorney, what questions do you ask? It's interesting. I thought about this last night. I said, it's interesting that when you ask a question, you also give information out. So when you ask a juror questions, sometimes you're conveying something to the juror, so you've got to be careful. I thought about this questionnaire. I thought it was very interesting. Apparently, both sides agreed to these. I don't think this is common in Ohio. Apparently, both sides had input into the questionnaire. I thought to myself, that was interesting. You give a jury a question, a lot of publicity on this case. I mean, you're telling the juror something, prospective jurors, that some attorneys might not think would be a good idea to just let it lie. I don't want to remind the jurors. Pardon me? That issue is not before us. Yes, that's correct, Your Honor. This questionnaire. Yes. Does the court have any further questions on our position on that? Which doesn't go to the merits. Go right ahead. I appreciate your advocacy, Mr. Willey, and you've argued before us before. I found, I must say, that the headings in your brief were obscure. They just say, argument number one is that the second ground for relief doesn't warrant relief. Argument number two is that the ninth ground doesn't warrant relief. And number three is that the eighth ground doesn't warrant relief, which requires us to go to some third place to figure out what the structure of your argument is. And in a dispute where your opposing counsel has arranged the arguments in a completely different order from the way you're arranging them, it would be useful to me, and I don't speak for my colleagues, it would be useful to me if these headings had something to do with the issue rather than with the number. Am I making sense? Yes, yes you are, Your Honor. Thank you. That's just in the way of a tip. No, it doesn't make very much sense, Your Honor. It doesn't make very much sense. I guess sometimes you, sometimes, some are better than others. I guess you just get into it and the numbers mean something to you, but they may not mean something to you immediately. Absolutely, Your Honor, and you're right. I've been doing this for a while and I still make mistakes. I mean, sometimes you think, you start to think you know quite a lot, and you find out that you don't know as much as you think you do. But, Your Honor, I'd like to just very briefly address the second issue of the ineffective assistance of counsel claim in mitigation. In this case, Your Honor, we would submit that counsel really had a difficult job. This case does not present the typical mitigating circumstances that are usually sought for and sought to be proven in a death penalty case. You're talking about a case involving cold-blooded, calculated murder for money. And faced with that, and faced with a claim of innocence, I mean not guilty, counsel was given the dilemma of vigorously arguing reasonable doubt. And then, when the jury had obviously rejected that, coming up with a theory of reasonable people is consistent with that defense. I would submit, Your Honors, that this counsel did a good job. Yet, his theme here was rather straightforward, that Mr. Hand was salvageable. But he presented significant evidence in that regard. He presented the psychologist who had a considerable background working for the corrections departments and who had a lot of in making that a possible mitigating circumstance. It's true that the counsel did say, or the doctor testified, that yes, he looked at the background. There was extensive investigation, and he did, as the district court found, he did indicate that yes, there were some circumstances in Mr. Hand's childhood. He did say that he considered that Mr. Hand's father had divorced his mother, that there was an abusive relationship there, that the family had been reported to the family services department, that they had been taken away for a certain period of time. There was evidence there that Mr. Hand's childhood, his background, was not perfect. When you say there was that evidence, was it that Davidson did present some of that evidence, but just didn't make as big a deal about it, or was it saying that Davidson knew that, but he didn't say it? Oh, he said it, Your Honor. He said it. I mean, he was very thorough in reviewing what, in talking about what he reviewed, what he was asked to review. He made the point that, you know, obviously you got to look at everything. You got to really get involved and look at the background and so forth. He also brought out that Mr. Hand was a veteran. He served in Vietnam. He brought out that these types of ... he brought out that Mr. Hand had qualities which would make him a person who would be suitable. I take it, as compared to many death crimes, he had established a relatively successful life. I mean, he had to have paid the premiums on these insurance policies and that sort of thing, which would go to the salvageable. You know, he seems to be a useful human being aside from his crimes. The more you emphasize how rotten his background is, the more you undercut that. Yes, yes. This is definitely ... I mean, this is a case where a strategy was chosen and anyone reading this record could see this was a strategic choice to go this way and that would have tended to undercut ... those types of things would have tended to undercut that theory. Your Honors, we would submit that in this case, to the extent that Mr. Hand presented his claims appropriately and they were denied by the state courts, that the state courts were reasonable, to the extent that they were the less concluded rightly that there was no basis for habeas corpus relief. And with that, we would ask you to affirm the judgment at the District Court. Okay. Thank you. Seven minutes for rebuttal. Your Honor, the first topic I'd like to reference regards the pretrial strategy and specifically any notion that there was any strategic call here made by either trial counsel or direct appeal counsel in not including this claim. In fact, both lead counsel in this case, Terry Sherman, and appellate counsel were deposed in this case. There was an evidentiary hearing. And with respect to 62 says, seemed he probably was involved. And 63 says, yes, she thinks guilty, yes. That would have caused me major concern. And you're telling me she's on the jury? Okay, you know, I don't know what she said, but that's not good. This is Mr. Sherman, lead trial counsel for Mr. Hand, talking specifically about these questions and in the juror questionnaires. The page ID with respect to Mr. Sherman talking about the Ray questionnaire is page ID 834. 834? Correct. That's what you're reading from? Correct. And so this is him saying that he would be concerned by those questions? Yes. So is this the type of answer that you would have wanted to follow up with this juror about, yeah, I think we would have asked her on bar dire. He goes on to state at 835, yeah, I probably wouldn't want that juror. That's with respect to juror Ray. This is the same guy who was the trial attorney, who was in the room. Who did not ask any questions. And this is what, how many years later? Six, five, eight years later? Yeah, oh nine, so about six. Yes, he was deposed in this habeas case. Then did they ask why didn't you? That would seem the logical next question. That question wasn't asked, but let me read you from, on Finnemore, because we do, that does, we do get at that question. And 62, seemed he probably was involved, and 63 says yes, she thinks he's guilty. Answer from Mr. Sherman, yes. Okay, again, these would have caused, answer, that would have caused me major concern, and you're telling me she's on the jury? Okay, you know, I don't know what she said, but that's not good. Yes. Okay, the question, okay, that's not good that she thinks he's guilty before she's come in the courtroom. Answer, no, no, that's not good, no. Question, okay, and again, these are answers that you would have wanted to follow up with her in those. Well, I would think that, yeah, if we didn't, we were remiss, so we should have. So that is, in this record, it's the direct testimony of Mr. Sherman. You finally get the, if we didn't, we were remiss. Correct. Okay, so when the counsel for the same guy gets on seven years later and says, if we didn't, we were remiss, then he gets a reversal for his death penalty client. Well, I think the question is, one, was there any strategy here? No, you do have trial counsel saying, I should have followed up on this. This was a major concern. I did not. And this was before Judge Beckwith? This was when the case was pending in the district court, correct. It was an evidentiary hearing. We were granted the right to take. Is that discussed by either side before the judge in terms of, does she find him credible, that sort of thing? We have a reference in our critical mistake, and I'm pretty certain there are references below. Did the judge say anything in her district court opinion? No, there were no references to any of these trial transcripts, and, you know, I think... Well, I mean, we were just reading the stuff your adversary was reading or from the trial transcripts. It is in the record. I, you know, I'm... I mean, Judge Beckwith was aware of the trial transcripts. I'm referring, you're saying now to, I mean, the state trial transcripts, referring to the trial before Judge Beckwith. I'm just asking whether this seemed to be a point that she considered or got into her opinion at all. We had a hearing before Judge Meurs. There was no hearing before Judge Beckwith, and this language is coming from the deposition of Mr. Schiff. Okay, and so was there part of the argument before Judge Meurs was, my gosh, if the counsel says he's ineffective, he's got to be ineffective? There was no argument. There was simply an evidentiary hearing. And so then if we look at Judge Meurs's opinion, would we report and recommendation, I guess, would we see anything about how strong that statement is? No, you would not see anything in the report and recommendation, and you wouldn't see anything in the district court opinion. I'd also like to refer the court to the deposition of Stephen Farrell, who was one of the lead attorneys on the direct appeal. Here's his reference, as we mentioned, the record was supplemented with the juror questionnaires. Here is what Mr. Farrell says. You say it was supplemented, is that because they weren't in the state court record? That's my understanding, that for whatever reason they weren't in the regarding the juror questionnaires, and he's referring to a younger attorney who worked on this case. I recall sitting down with Wendy. I know that when the juror questionnaires came in, I'm giving them to Wendy right away in our brief, right away, and our brief is filed, so we're not under a tight deadline. So they filed their brief, they then get these questionnaires, and the question becomes, do they file a supplemental brief? But obviously if something's in here, we need to see what we can do and see if we can file a motion for a supplemental brief. He then says, she comes back and says, I don't see anything in them. He then goes on and I'll cite the courts to page ID 1196. Would you agree with me that if a juror expressed a potential feeling of guilt prior to the trial, that that was a concern? Yes. Yes, and I would expect follow-up questions of trial counsel in voir dire on that issue, and had that process not occurred, would that then create a potential ineffective assistance of counsel claim on appeal? Yes, and especially in this case where I knew sitting as somebody who lived in Columbus at that time that this was a big case, and my recollection of the voir dire was that there was, that was a big part of the voir dire was the media coverage. So we also have direct testimony from the lead appeal counsel saying that, yes, if he had known what was in those juror questionnaires, particularly with respect to Ms. Nemour. Well, that's not quite the same. That is, I suppose if I were, if I thought I would get a good answer, I would have asked, and after reading what the judge said in the answer given you, would you still have been very concerned? But that wasn't the way the question was asked. That is correct. That's not the way the question was asked. Can I ask a question that I concede is irrelevant, but I just have a curiosity since I asked your opposing counsel an irrelevant question. That's fine. You know, I haven't tried a capital case or a criminal case, so I don't know, but I'm curious. It seems to me that a defense counsel, even when you're just arguing reasonable doubt, would kind of have some sort of theory of what might have happened other than the story that the prosecutors are telling. There's got to be some sort of possibility in the juror's mind that something else happened. Does that make sense? I mean, that seems to be like you would be wanting that to arise, and I'm just having trouble seeing what that would have been here with respect to the defendant's view of what Mr. Welch was doing there in that alternative theory. Is my question making sense? Your question does make sense, and I, you know, my sense is trial counsel struggled with it, and when you read Mr. Sherman's deposition, I think it's clear that his view was they're just going to have to attack the witnesses, but if Mr. Hand is... There was no alternative suggestion or... There was self-defense that he happened to just come in. I'm asking why he was even in there shooting. I mean, it was self-defense after Welch went in and killed his wife. What was the theory for... I mean, the prosecution's theory is he was paid to go in and kill her. What's the... And sometimes the lurking reasonable doubt is that some stray drug addict came into the house and shot the victim instead of the other person who lived in the house. You see what I'm saying? I do. And even though there's no evidence whatsoever, you say, but it's reasonable to doubt maybe that did happen, but it's kind of... This is somebody he knew who was in there killing his wife, right? Is there any kind of theory for why that would have... Wild speculation about why that would have happened other than the reasons that support the verdict? I think the closest I could come in reviewing the record is Welch came in to try to steal something from the house. Okay. Mr. Hand was there. Mrs. Hand was there. Welch shot Mrs. Hand and he shot Welch. That's the best understanding. That's helpful. Thank you. I mean, if Welch knew him, he knew that he was, by some standards, a man of some means. Right? I mean, he had enough money to have a house and pay insurance premiums and so forth. Correct. Okay. Anything else, judges? Okay. Thank you. Thank you. That case will be submitted. We appreciate...